# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| Bakken Residential, LLC, | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| Plaintiff, | ) | **AND ORDER FOR JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:12-cv-146 |
| Cahoon Enterprises, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Bakken Residential, LLC ("Bakken") commenced this action on October 19, 2012, against Cahoon Enterprises, LLC, ("Cahoon"), several weeks after Cahoon declared that it considered a real estate purchase agreement between the parties to have terminated because of Bakken's failure to close on the property. Bakken had entered into an agreement with Cahoon to purchase 42.74 acres of land in the small community of Ray, North Dakota, during the height of the Bakken oil boom hoping to develop a large mobile home park on the western half of the property and make available for sale developed commercial lots in the eastern half. Bakken's complaint asserts claims for breach of the purchase contract, unjust enrichment, and quantum meruit.

Initially, the major thrust of Bakken's action was to obtain specific performance with its requests for damages being secondary. This is because Bakken continued with its development efforts after the action was filed, including spending money on final engineering and an updated appraisal for its lender. And, in an attempt to prevent the sale of the property to someone else in the interim, Bakken filed a lis pendens. It was not until 2015, when the demand for oilfield workforce housing was collapsing with the falling oil prices that Bakken abandoned its request for specific performance and focused instead on its arguments for damages.

1

At trial, Bakken's primary focus was upon its claim for unjust enrichment, believing this would result in the largest dollar recovery. Essentially, Bakken's argument is that all of the work it did on its proposed development in terms of planning, engineering, obtaining preliminary governmental approvals, and insuring that the site had adequate utilities (what it refers to collectively as "entitlements") substantially benefitted Cahoon by making the property more valuable than what it was without all of these things, *i.e.*, as "unentitled" property. Bakken contends that the court should enter an award against Cahoon for this increased value notwithstanding its own inability to capitalize on what, by its estimates, amounted to more than a doubling of the value of property.

In the alternative, Bakken seeks to recover the amount that it spent on its development as well as for a return of the earnest money deposited as part of the purchase agreement. Bakken contends that these amounts are recoverable at law because of Cahoon's alleged breaches of the purchase agreement or, alternatively, in equity based upon on a claim for quantum meruit.

Cahoon moved at trial for dismissal of the action, contending that North Dakota law prohibits a foreign limited liability company from maintaining any action, suit, or proceeding in any court of this state until it possess a certificate of authority and that Bakken had let its certificate authority lapse prior to initiating this action and did not have one at the time of trial. This was the first time Cahoon raised this issue. Apart from that, Cahoon denies it breached the purchase agreement or that any breach was a proximate cause of the damages being claimed by Bakken. Cahoon also contends that equitable relief is not appropriate.[1]

---

[1] Cahoon also asserted a counterclaim in which it alleged that Bakken had wrongfully filed a lis pendens against the property and that it suffered damages as a result. However, the counterclaim was abandoned when Cahoon failed to litigate it at trial, including not presenting any evidence of damage.

The case was tried to the court on June 2-3, 2015. Thereafter the court allowed time for the parties to submit post-trial briefs.

## EVIDENTIARY RULINGS

In each instance in which the court reserved ruling on the relevancy of a particular exhibit or item of testimony, the court has overruled the objections and given the evidence the weight it deserves under the circumstances.

## FINDINGS OF FACT[2]

### What happened

**1.**     Bakken is a Colorado limited liability company. Its members are Todd Oltmans and Michael Wilson, both of whom are from Colorado. Oltmans is a real estate developer and Wilson a dealer of manufactured homes and an investor in mobile home parks.

In 2011, Oltmans and Wilson began exploring the possibility of developing real estate in the Bakken oilfields in northwestern North Dakota because housing was then in short supply and the region one of the top-ten rental markets in the country. Given Oltmans' and Wilson's particular expertise, they were looking for an opportunity to develop a mobile home park for housing oilfield workers. They explored several possibilities and one that they eventually decided upon was a 42.74 acre tract located in Ray, North Dakota, that was listed for sale by Cahoon.

Oltmans and Wilson soon brought on another individual, Brian Robinson, to assist in obtaining the permits and approvals for the development of the property and then later to oversee the construction. Robinson is also from Colorado. He has an engineering degree and substantial

---

[2]  These are the court's principal findings of fact as required by Fed. R. Civ. P. 52(a)(1). Additional findings of fact may appear in the conclusions of law or vice versa, particularly when considering mixed questions of law and fact.

prior experience in real estate development. Robinson is described as being a partner in the development of the property although not a member of Bakken.

**2.** Ray is small community. According to a market analysis obtained by Bakken, Ray had less than 700 persons going into 2012, which was up from a population of a little over 500 just before the Bakken boom. Ray is located along U.S. Highway 2 north and east of Williston, North Dakota, about 35 miles away by vehicle. The 42.74 acre tract owned by Cahoon abuts the south side of Highway 2 in an undeveloped area south and east of the developed area of Ray, which is primarily on the north side of Highway 2.

**3.** Cahoon is a Montana limited liability company with Mark Cahoon as its only member. Mark Cahoon arranged for the purchase of the 42.74 acre in 2010 from Paul Weyrich for $22,000 with the assistance of his mother. Title to the property was initially put in his mother's name and then later transferred to Cahoon, the limited liability company.

Following the purchase of the property, Cahoon obtained a state license for a mobile home park on the site for up to ninety units. And, while the record is somewhat unclear, it appears he also obtained a more limited initial approval from the City of Ray for a phase I development of 18 units. Eventually, Cahoon decided to abandon his effort to develop the mobile home park because he lacked the resources to put in the paved streets that the City was requiring. He then put the property up for sale.

**4.** Bakken began negotiating the terms of a purchase agreement with Cahoon's listing agent, Ryan Visser, in the latter part of December 2011. The list price for the 42.74 acre tract was $4.8 million. On January 23, 2012, Bakken executed a written offer to purchase the property for $3.4 million that was accepted by Cahoon on January 30, 2012.

The initial purchase agreement was a two-page document. The first page was a standard offer-to- purchase form used by Visser. The second page, labeled Addendum #1, set forth a number of additional terms and conditions that were specifically negotiated by Bakken. The negotiations leading up to the execution of the initial purchase agreement were between Bakken and Visser. Bakken's members did not actually meet Mark Cahoon until after the initial agreement was signed.

**5.**     The initial purchase agreement provided that the closing on the purchase would take place on or before April 30, 2012, with Bakken's obligation to purchase the property being subject to a number of conditions that are discussed in more detail below, including a 60-day period to conduct "due diligence." The agreement required the deposit of $20,000 in earnest money that would be refundable under certain circumstances, including the inability of Cahoon to furnish marketable title and the election of Bakken to terminate the agreement prior to the expiration of the 60-day due diligence period.

**6.**     Soon after execution of the purchase agreement, Bakken retained Interstate Engineering to do a preliminary design for its proposed development of the property, which it named "Ray Crossing." The preliminary layout provided for subdividing the western half of the tract into 102 individual lots along with city streets. Bakken planned on placing mobile homes on each of the lots that it would retain ownership of and rent out on a bedroom basis with no restriction upon the individuals living within the mobile homes having to be a single family or otherwise related. This was because the target market for renters was primarily oilfield workers. The preliminary design further provided for the eastern half of the 42.74 acre tract to be divided into seven lots of various sizes for commercial development, including possibly a truck stop, one or more motels and restaurants, storage units, possible retail, etc.

From the outset, Bakken's proposed development was a highly speculative venture. Bakken itself did not have substantial money to invest in the project. Also, it had no binding commitments from any entity for the purchase of its commercial lots. Essentially, Bakken required 100% financing and, for that, it had turned to Momentum Funding, LLC ("Momentum Funding"), a private capital group. According to Oltmans, Bakken chose Momentum Funding because it had financed mobile home parks in other parts of the country. Also, Oltmans had a prior relationship with the firm.

According to the testimony of Bakken's principals, Momentum Funding needed to do its own evaluation of the viability of the Ray Crossing project (what Oltmans referred to in his testimony variously as Momentum Funding doing its own "due diligence" or "underwriting") before it would advance even the amount required for the purchase of the property. Based on this testimony as well as various exhibits, the assurances that Momentum Funding needed before advancing money for the purchase of the property, and for which it intended to take a mortgage to secure its loan, included: (1) evidence that Bakken had acquired, or would be able to acquire, the necessary permits and approvals; (2) there being sufficient utilities in place to serve the proposed development; (3) an appraisal/market analysis demonstrating the project's economic viability and supporting the purchase price; and (4) assurances of Bakken obtaining good title, including title insurance that would extend to it as a mortgagee.[3]

---

[3] There is an unsigned letter that Momentum Funding purportedly sent to Bakken when the project was in trouble stating that one of its requirements was a lender/mortgagee title policy that would be devoid of certain standard exclusions. That this was likely a condition from the beginning is supported by the fact that, notwithstanding Cahoon's obligation under the purchase agreement to provide title insurance for Bakken's benefit, Oltmans himself contacted the title company shortly after the purchase agreement was signed about obtaining a title commitment. This point is discussed in more detail later.

One of the consequences of Bakken lacking substantial resources of its own was its inability to complete the purchase of the property within the time frames required by the purchase agreement when certain problems arose that prevented it from being able to timely satisfy one or more of Momentum Funding's conditions precedent for funding. In other words, Bakken was not able to complete the purchase of the land, work out any problems in terms of developing the property later, and then resell the property if things did not work out. This put Bakken in conflict with Cahoon, which was concerned about delaying the closing too long. Cahoon's fear was that Bakken might not be able to complete the purchase given its lack of financial resources and, in the meantime, it might have lost out on a potential sale to another purchaser in what obviously was a frothy market, given Cahoon's ability to acquire the property for $22,000 and then turn around and enter into a sales agreement for $3.4 million not too long later.

**7.**     While still within the 60-day due diligence period, it soon became obvious that Bakken faced at least two obstacles that likely would prevent it from obtaining the money to complete the purchase by the originally scheduled closing date of April 30, 2012. Probably the most significant was Interstate Engineering advising Bakken that the City of Ray lacked sufficient sewage treatment capacity for Ray Crossing. This was a problem that could not readily be addressed to the satisfaction of Momentum Funding in a short time frame.

The second obstacle was acquiring the necessary local approvals. The zoning for the 42.74 acre tract at the time of purchase was "highway commercial." In order to develop the portion of the tract for a mobile home park, the City advised Bakken that it needed to obtain a zoning change to some form of residential zoning for that portion. Also, the property was not platted in the way that Bakken wanted to develop the property. This necessitated Bakken having to go through the platting

process. Finally, given the size and nature of Bakken's proposed development, the City was going to require that Bakken obtain the equivalent of a conditional use permit, a process that allowed the City to attach conditions to its approval of the project, which, as discussed later, were going to substantially add to its cost. It soon became obvious that the process of getting the necessary permits and approvals (or least sufficient assurance that they could be obtained upon terms satisfactory to Momentum Funding) was not going to be completed prior to Bakken having to ante up for the purchase of the property by April 30, 2012.

In recognition of these problems, Oltmans emailed Visser on March 13, 2012, requesting that the closing date be extended to July 15, 2012. The reasons given in the email essentially were (1) the unlikelihood of Bakken obtaining the necessary approvals and permits to insure it could proceed with its project by April 30, given that it had to start from scratch after determining that Cahoon's mobile home park permit was not enough and the fact that the City would not be receiving word until June on whether its grant application to cover part of the cost of expanding it sewage treatment capacity would be approved, and (2) the need to investigate other issues that had arisen, including the possibility of having to bring in a substantial amount of fill for the site. Bakken stated that it remained confident, however, that a July 15 date for closing could be met if not sooner.

**8.** While Bakken was not in a position to close on the purchase at the end of April, Cahoon also had a problem. The initial purchase agreement required that Cahoon provide a preliminary commitment from a title insurance company within 30 days of execution of the initial purchase agreement, which would have been on or before March 1, 2012, and then a title insurance policy at closing. By March, Cahoon had missed the date for providing the initial title commitment and was in danger of not being able to provide it before April 30 as well as the actual title policy on

that date. In fact, as it turned out, Cahoon was not able to provide the initial title commitment until July 19, 2012.

To make matters even more confusing, Bakken decided that it needed an updated abstract for its own purposes and soon began making demands for one, contending that Cahoon was required under the purchase agreement to have provided an updated abstract within five days of execution of the agreement. However, the agreement clearly said nothing of the sort. The earliest Cahoon would have been required to provide an updated abstract under the purchase agreement would have been at closing and a fair reading of all of the provisions together is that even this was not required since the parties had agreed upon title insurance.[4]

In order to understand the reasons for the delay in the providing of the title commitment, some understanding of the process that the title company employed by Cahoon (and also it appears by Bakken) to provide the title insurance required by the purchase agreement (and separately by Momentum Funding) is necessary. The process that the title company followed in giving an initial title commitment was to: (1) first prepare an abstract for the property or update an old one; (2) have an attorney review the updated abstract and prepare a title opinion; and (3) issue a title commitment from a third-party title insurer based on the title opinion. Later, at the time of closing and probably after a quick check of the public records for any last minute filings, the title company would issue an actual title policy from a third-party title insurer for which it was an agent.

There is some indication in the record that a month or so may have passed following the execution of the purchase agreement before Visser delivered Cahoon's old abstract to the title

---

[4] The first page of the purchase agreement required the seller to provide an updated abstract at the time of closing *or* title insurance at the seller's option. The initial addendum required a title commitment within 30 days of execution of the agreement and a title insurance policy at the time of the closing with no mention of an updated abstract.

company. Whether this initial delay was the result of an oversight on Visser's part or whether there was some initial confusion with respect to who would be following through on getting the title commitments is not clear. Notably, Oltmans contacted the title company on February 8, 2012, to ask for a title commitment - probably because it had already been advised by Momentum Funding that it was requiring its own mortgagee title policy. This contact is documented by a followup email that Oltmans sent to the title company the same day confirming his request for a "title commitment." Bakken later points to this email as evidence that it started asking for an abstract for the property back in February. However, the email makes no mention of an abstract and the credible evidence is that Oltmans, who had previously not done work in a state where abstracts are used, initially focused only upon obtaining the title insurance. It was not until later in April that Bakken's engineer asked to see an abstract to obtain information with respect to the utility easements on the property. And then, sometime after Bakken retained an attorney in May to help with the purchase of the property and the permitting, the attorney advised Bakken that it should obtain its own title opinion and that an abstract would be needed for him to prepare one.[5]

The first documented request for an abstract by Oltmans was on April 18, 2012, when he emailed Visser asking him to forward the abstract because both the engineer and the title company needed it as soon as possible. There are two things of note with respect to this communication. First, it appears that Oltmans had been in contact again with the title company inquiring about the status of the title commitment. Second is the fact that no mention was made at that time about a need for an abstract so that Bakken could conducts its own title examination. Visser responded to

---

[5] Actually, an abstract is not necessarily required. An attorney could conduct his or her own examination of the records at the courthouse and not rely upon an abstract.

this email, in part, by stating that he had delivered the abstract to the title company a week earlier, that the updating of the abstract was underway, and that it likely would take 2-4 weeks before the update would be completed.

It appears the updating of the abstract may have been completed on April 20, 2012, since that is the date of the last certification by the abstractor in the abstract. Bakken contends that Cahoon acted in bad faith by not making it available at that time. However, as alluded to earlier and will be addressed later, Cahoon was under no obligation to provide one, either as a matter of good faith or otherwise. Further, Bakken ignores the rest of the process for completion of the title commitment that Bakken expressly negotiated for, which was that the abstract (or at least the one Cahoon had updated) needed to be given to an attorney for the preparation of the opinion that would then be used by the title company to issue the preliminary title commitment. The evidence is that this process was not fully completed until July 19, 2012, when the title company provided Visser with the title commitment that was based upon an opinion it had received from its attorney dated July 9, 2012, along with the updated abstract. Then, and not to get too far ahead of what otherwise was happening in mid-April, Visser emailed the title commitment to Bakken on July 19, 2012, which is the same day he received it. He then hung on to the abstract in anticipation that he would be meeting with Bakken's principals in Williston for a meeting that was planned for July 24, 2012, five days in advance of the extended closing date of July 31, 2012.

What is notably absent from the evidence presented is whether Bakken, if it really needed an abstract because it was the only thing standing in the way of it being able to close (as opposed to it initially being simply one of several items on the critical path, and not the primary one, and later, perhaps, a convenient excuse for its inability to close) made any effort to check with the

abstract company to see if it could purchase its own abstract or have permission to use a copy of the one that the title company or its attorney was using. Later, after Bakken obtained counsel, there is an email from the attorney where he instructs Oltmans on what he would need to do to get an updated abstract.

**9.** In early April 2012, because of the delays making it improbable that either party would be ready to close by April 30, the parties revised the purchase agreement by executing a one-page document entitled "Addendum." This document was signed by Cahoon on April 2, 2012, and by Bakken the next day. While this was the "second addendum," it was the first amendment to the purchase agreement since the initial purchase agreement had an addendum.

The first amendment/second addendum, as typewritten, contains six provisions. The first required the payment of an additional $30,000 in earnest money bringing the total amount on deposit to $50,000. The second and third provisions stated, respectively, that $20,000 of the earnest money would become nonrefundable upon preliminary plat approval and the remaining $30,000 would be nonrefundable upon final plat approval. The fourth provision extended the closing date to 30 days following final plat approval but, in any event, not later than July 15, 2012. The fifth provision provided Cahoon with the right of first refusal to purchase all contract drawings and consultant reports developed by Bakken at cost within fourteen days if Bakken did not perform. The sixth provision required Bakken to pay Cahoon monthly installments of $20,000 beginning June 1, 2012, which would not be credited to the purchase price. After the listing of these provisions, there is a statement that all other terms and conditions of the original contract were to remain in

place.[6]

Finally, on the copy of the first amendment/second addendum submitted as an exhibit, the typewritten number "15" for the closing date of "July 15" is crossed off and replaced with the number "31," and this change was initialed by both parties. Also, in the version submitted to the court, the sixth provision requiring the payment of $20,00 per month is crossed out. It appears from other documents and record evidence that these changes were made later when it became clear that the July 15 date for the closing could not be achieved. But whether this is true or not is not critical to the outcome.

**10.**    In May 2012, Oltmans sought assistance from Benjamin Johnson, a local attorney from nearby Tioga, North Dakota, to assist in obtaining city approvals for Bakken's project and helping to close on the real estate purchase, including handling any further negotiations with Cahoon. **11.**    The preliminary plat for Bakken's project was approved by the City on May 14, 2012. But, even with that approval, a number of items remained open between Bakken and the City, some of which needed to be resolved before Bakken was willing or able (because of Momentum Funding's requirements) to go forward. The primary issue was the City's unwillingness to make any commitment as to when it would have sufficient sewage treatment capacity available. However, there were others. There was the issue of what the sewer hookup fees would be. As noted in a later email from Oltmans, the City was demanding upwards of $1 million in hookup fees for the entire project. Also, the City was demanding that Bakken fund improvements for a new city park on property adjacent to Bakken's site to the tune of $60,000 - $80,000. Further, the City had

---

[6] While not entirely clear, it appears the second addendum was intended to be an additional addendum and not a replacement of the addendum attached to the initial agreement.

demanded that Bakken make available to it up to ten of its mobile home units for its use, and it is not clear from the record what the status of that was by the time of the preliminary plat approval.

 In short, there were a lot of unknowns in terms of potential costs and when revenue could start being generated given the uncertainty at the time as to when sufficient sewage treatment capacity would be available, if at all.

**12.**      On June 1, 2012, attorney Johnson submitted a proposed "addendum #3" to Visser that referenced the original agreement, including the first and second addendums.  The first provision in the proposed "addendum #3" eliminated the sixth provision from the second addendum requiring the additional monthly payments of $20,000 beginning June 1, 2012.  The second provision called for reducing the sales price from $3.4 million to $2.9 million.  The third provision provided for a return of all earnest money if the City of Ray did not (1) provide a "will serve" letter for sanitary sewer service indicating it would provide sufficient service to Bakken's proposed development by December 1, 2012, or (2) approve a plan for private sanitary sewer service until city capacity would become available.  This latter provision would have reversed the fact that, under the amended purchase agreement then in effect, $20,000 of the $50,0000 deposited as earnest money had become nonrefundable with the approval of the preliminary plat. Johnson's June 1 proposed addendum #3 went nowhere.

**13.**      Oltmans then submitted another version of a proposed "addendum 3," a copy of which was not made a part of the record, to Visser by email on June 18, 2012.  The email accompanying the proposed addendum went on to state:

> Please see the attached revised Addendum #3 for you review.
>
> We realize through the latest number of recent disappointments on the project including the denial of our proposed private sewer option and the statement from the city engineer

14

declaring no sewer service will be available until 2013, that adjustments must be considered.

Please review with Mark the specifics outlined below and respond promptly. We expect that communication lines will remain open with the opportunity to freely discuss any questions.

HOW WE GOT HERE:

1. City's ability to provide capacity in 2012 for sewer - summer of 2013.
2. CITY TURNED DOWN PRIVATE SEWER OPTION. * * * *
3. INCREASED impact fees/ $408K for sanitary - $295,800 for Water = $703,800 / $6900 per lot vs $4K
   $2400 difference x 102 - NOW $7500 x 102 (Not INCLUDING Commercial) = $765,000
4. $100K for city housing
5. $60K for Park.
6. $20K per month staring June 1
7. $60K to relocate high voltage underground power line from NDU behind substation which we just found out.
8. 25% of project income loss down to 3 bedrooms /101 Bedrooms = Cost $1250 month/ $126,250 month / $1,515,000 yr /$4,545,000 3 yrs
9. All Project Design has been on hold since Mid May
10. No Abstract title at this time.

**Total additional cost and reduced revenue Year 1 = $2,921,000**

**Total Additional cost and lost revenue - 3 years = $5,951,800.**

With the above said, we have worked to maintain the purchase price of the contract. As shown the costs are escalating.

Obviously, there are several factors that are driving the contract, but the largest issue that needs to be determined is the sanitary sewer. We have worked to address the sanitary sewer in this Addendum. As we discussed, there are several avenues that we can work through. We need a solution determined and approved.

Lastly, when you get a chance, it would be very helpful to have the Title Abstract completed and forwarded to us asap.

This email made clear that Bakken was facing substantial problems in terms of it being able to complete the purchase of the property any time soon, much less by July 15, if Momentum Funding was demanding something more concrete, particularly with respect to the sewer capacity problem.

**14**.    On June 21, 2012, Oltmans emailed Visser stating that Bakken was continuing to work on a sewer solution, but indicated that it needed to know where it stood, which probably was

15

in reference to whether the closing date was going to get extended beyond July 15. Also, Oltmans stated that Bakken had reached a critical point in terms of the title work and that the engineer needed a copy of the abstract for the "ALTA" work.

15. Undoubtedly feeling the pressure of the upcoming July 15 closing, Oltmans emailed Visser again on June 28, 29, and July 2, 2012, requesting an updated abstract as soon as possible because it was needed by the engineer and for "underwriting." During one or more of the emails, Oltmans referenced an updated addendum #3 that it was signing and updated Visser on the status of the sewer situation. In the July 2, 2012 email, Oltmans advised that the City's grant for the expansion of it sewage treating facilities had been approved and that it was working with the City to obtain a "will-serve" commitment letter.

The next day Oltmans emailed Visser again, however, stating that he had learned the City would not commit to a date for when it would be able to provide the increased sewage treatment capacity nor would it guarantee that Ray Crossing would have first call on the increased capacity. According to Oltmans, the City's reason for the latter was that it did not know when Bakken might actually complete its project, particularly the development of the commercial portion. After learning this, Oltmans stated in part in his July 3 email:

> It is clear that the City will not commit to when there will be sewer capacity and service to the site.
>
> This is certainly making it hard to move with the $11.2M capital requirement for phase I [the mobile home park] without having 1) a Will-Serve Letter that shows a date when service will be available 2) or allow Bakken Residential to service the site privately.
>
> Lastly, as we are continuing to work through these issues, it is imperative to get the Title work completed. As it is now July 3, 2012, please let us know when the Title Abstract will be delivered.

Oltmans followed this up with another email following a conversation with Visser stating that they were in need of the "Title Abstract commitment" and were looking forward to receiving it on July 9, 2012.

16. On July 9, 2012, the title company forwarded to Visser a copy of the title opinion on Ray Crossing that had been prepared by the attorney it had retained. The same day Visser emailed the opinion to Oltmans, stating he hoped the title commitment would soon be forthcoming. While the opinion from the attorney for the title company has not been made a part of the record, Oltmans acknowledged during his testimony that it did not disclose any title problems and certainly not the issues raised later by attorney Johnson.

17. There is a further exchange of emails on July 12, 2012, in an attempt to finalize the terms of an "addendum #3." The new addendum #3 repeated the same six provisions as the previous typewritten addendum #2 except that the closing date of July 15 was changed to July 31 by writing in the new date. Also, the provision that called for the payment of an additional $20,000 each month beginning June 1 was crossed out. Finally, two new provisions were added. The new seventh provision acknowledged that Cahoon would have the right to do a section 1031 exchange in connection with the sale and the new eighth provision gave Cahoon sixty days to remove extra dirt that had been hauled onto the property.

The email from Oltmans on July 12 to Visser also stated that they had worked out with the City a draft of a will-serve letter that would not have a hard will-serve date but might be firm enough to indicate that the site would have sewer service in the second quarter of 2013. Oltmans indicated he hoped to obtain the letter at meeting that was going to be held on July 23. Oltmans did not indicate, however, that he had received assurances from Momentum Funding that the letter would

be sufficient.

18.     On July 19, 2012, Visser received the title commitment from the title insurance company and forwarded it Oltmans the same day by email.  The title commitment has not been made a part of the record.  However, attorney Johnson acknowledged it did not reflect any issues, including those he raised later.

The updated abstract was returned to Visser at the same time he received the title commitment. Visser waited to provide it to Bakken when its principals traveled to Williston for a meeting with Cahoon and Visser on July 24, 2012, which was five days prior to the closing scheduled for July 31, 2012.

19.     On July 24, 2012, attorney Johnson forwarded an email to Oltmans stating that he had reviewed the title commitment and was advising against relying only upon title insurance.  He recommended that  Bakken obtain its own title opinion.  The reason that he gave was that the title insurance would cover only the amount paid to purchase the property and not any improvements. Attorney Johnson said it would take 4-6 weeks to get an updated abstract and that it probably would cost around $1,200.

On July 26, 2012, attorney Johnson followed up with a second email, most likely after learning that an  updated abstract had now been turned over to Bakken.  He reiterated his advice about not relying upon the title commitment and  having him review the abstract to make sure that the title was good.  He said he would do what he could to speed the process up, but suggested that Cahoon should be agreeable to a short extension given the amount of time it took for them to deliver an abstract.

20.     On July 27, 2012, Oltmans forwarded to Visser the two emails he had received from

Johnson and requested additional time for closing on the purchase so that Johnson could complete his examination of the abstract and for his title opinion to be forwarded to Bakken's lender for "underwriting." Oltmans suggested that Bakken be given until August 12, 2012 to complete this process and that Bakken would be willing to consider an additional non-refundable earnest money amount after that point to resolve any issues beyond August 12, 2012 that may be raised by Johnson's review.

The credible evidence, however, is that there were problems standing in the way of Bakken being able to close on July 31 other than its somewhat late decision that the title insurance it had previously bargained for was now insufficient for its purposes. As discussed in more detail later, Bakken had not yet commissioned the performance of an appraisal/market study that it acknowledged was a condition precedent to any funding and that was not in any way title dependent. And, while that alone would have prevented it from obtaining the funds for closing, the testimony of Bakken's principals suggests that Momentum Funding had other concerns. They specifically testified that Momentum Funding was concerned that the increased sewer capacity would not be available until well into the next year, assuming the City would be successful in getting the expansion completed. The court suspects that the lack of final plat approval along with resolution of the City's conditions on the project, which carried with it sizeable financial consequences, were also problematic. Finally, it is apparent that Momentum Funding would have needed more time simply to put in place what it needed for closing (preparation of mortgage agreements, etc.) even if it had completed its review in terms of the project's feasibility, which it obviously had not given the lack of the appraisal.

21. Visser forwarded an email letter to Oltmans on July 30, 2012, stating that Cahoon

preferred to close the next day but would be willing to extend the closing an additional two weeks in exchange for an extra $100,000 of non-refundable funds that would not be included in the purchase price. Visser stated that, if Bakken still wanted to move forward but did not want to close the next day, he would prepare a form for Bakken to sign acknowledging the conditions.

22.     It appears Cahoon had arranged with the title company to perform the closing on July 31, but Bakken did not show up.

23.     On August 7, 2012, attorney Johnson emailed Visser stating that Bakken was unable to close on July 31 because of conditions beyond its control. The reason he gave was the fact the abstract was not provided until July 24, five days prior to closing, even though, according to Johnson, Bakken had been requesting the abstract since February 8, 2012, when Bakken was in direct contact with the title company. Johnson went on to state that "[n]o buyer with any understanding of property law would close on development property without doing his own title research and no investor of any level of sophistication would back a project without assurance that title is good." Johnson also went on to imply that Bakken was delayed because it had relied upon information provided by Cahoon and Visser that there were sufficient utilities serving the property and the site was otherwise fully functional for Bakken's intended use, which, according to Johnson, turned out not to be the case. These points will be returned to later.

With his email, Johnson proposed an "Addendum 4." The new proposed addendum set forth three provisions. The first would give Bakken an additional thirty days from July 24, 2012, to review the title commitment and abstract furnished by Cahoon. The second would make the $50,000 of earnest money on deposit refundable during a period of 30 days following execution of the new addendum if Bakken elected not to proceed with the project and nonrefundable 31 days after

execution of the addendum. The third provision provided for a closing 45 days after execution of the addendum. (Ex. P4).

24.     Visser responded to this email on August 8, 2012, stating that Cahoon was not willing to accept the proposed Addendum #4 but that he was willing to extend the closing date to August 23, 2012, which the email noted would be 30 days from when Bakken received the abstract of title. The abstract itself is not very long and likely could be examined in less than a day.

25.     On August 10, 2012, attorney Johnson provided Bakken with a memorandum stating that he had conducted a preliminary review of the abstract and noted that it contained copies of a number of federal tax liens dating back to 2008, or before, along with a reference to a 2008 state-court judgment, all of which were filed during the time the property was owned by the person from whom Mark Cahoon's mother had purchased the property. Johnson recommended that Visser contact Cahoon to see what its position was with respect to these items.

26     On August 14, 2012, attorney Johnson wrote Visser a letter proposing a second version of a new "Addendum #4." In the letter, Johnson claimed that a new addendum was necessary because of what he claimed were material breaches by Cahoon of the agreement. He also threatened a suit for specific performance and damages if the new addendum was not executed. Specifically, Johnson claimed that Cahoon had deliberately withheld the updated abstract, title commitment, and the attorney's title commitment until very late, even though, according to Johnson, the abstract had been available earlier and was actually due under the contract on February 5, 2012. Johnson then went on to claim that there were significant issues with respect to the title because of the federal tax liens and the state-court judgment that had been included in the abstract - problems that he claimed could possibly have been resolved months ago if Cahoon had provided the

updated abstract earlier. The new proposed Addendum #4 set forth two provisions. The first was that the buyer and seller would agree that review of the abstract was a due diligence provision that fell within the 60-day due diligence period as set forth in the original purchase agreement and that would start anew on the date the new Addendum #4 was executed. Notably, Johnson's choice of language with respect to this provision is somewhat odd and appears to a reflect a concern about the fact that the original agreement did not require Cahoon to provide an updated abstract if title insurance was going to be used. The second provision called for a closing to take place 30 days from the expiration of the new 60-day due diligence period.

Essentially, this proposed addendum would provide for an additional 60 days for Bakken to consider its options and withdraw for any reason, including presumably getting back all of the earnest money paid since that was not addressed. Further, it would push back any closing for another 90 days.

27. Attorney Johnson provided Bakken with a formal title opinion dated August 15, 2012. In the opinion, Johnson concluded that Cahoon had title to the property but noted the previously referenced federal tax liens and the state-court judgment against one of Cahoon's predecessors-in-title and stated as "requirements" that satisfactions or releases of these liens need to be *filed* not only with the appropriate county offices where they are normally filed but also *recorded* with the recorder's office, notwithstanding the certifications in the abstract by the abstractor discussed later, which, essentially, were to the effect that there were no unsatisfied federal tax liens or state-court judgments.

28. Cahoon then retained attorney Peter Furseth to respond. Furseth was the attorney that the title company had retained to provide it with the opinion of title, a copy of which had earlier

been forwarded to Bakken. In a letter dated August 27, 2012 to Johnson, Furseth stated that, although Johnson's letter raised some reasonable issues, Bakken had failed to comply with the purchase agreement and its subsequent amendments. Furseth stated that Cahoon was willing to extend the closing date to 30 days from the date of the letter, which would have been on or before September 26, 2012.

**29.** Johnson responded to Furseth's August 27 letter by sending a letter dated September 9, 2012, rearguing who was responsible for the current situation and contending that the matter had been at a standstill since July 15 because of Cahoon's failure to timely respond and agree to the multiple addendums he had forwarded. He then went on to state that "there had been too many timeframes set by addendums that are unattainable," but without any explanation for why Bakken had signed them. He then proposed a new addendum containing a single provision that the closing would take place 90 days from when the last party executes the addendum but not later than December 5, 2012.

**30.** On or around September 9, 2012, Bakken engaged THK Associates, Inc. ("THK") to perform an appraisal/market analysis for the Ray Crossing Project. The THK witness who testified at trial indicated that THK was told it had twenty days to complete the work and that it was on a "rush" basis.

Oltmans and Brian Robinson both acknowledged during their testimony that completion of an appraisal such as the one THK performed was a condition precedent of Momentum Funding making any decision on whether to advance funds for the purchase of the property.[7] Neither had a

---

[7] Specifically, when asked to explain why Bakken should be awarded the costs for completion of THK's report as a damage item, Oltmans testified: "we needed these market analysis reports completed as part of our funding requirements. These were costs incurred for closing." Robinson likewise testified that THK's report was "a capital requirement" and "a critical piece of information that we needed to move towards closing."

good explanation for why Bakken had not engaged THK earlier. A fair inference is that Bakken simply was not willing to incur the costs initially when the sewer capacity issue was more uncertain and had internally concluded that it would be able to delay the closing. THK completed its "preliminary" appraisal/market analysis and issued a written report dated September 26, 2012.

31.     At some point prior to September 26, 2012, Visser had made arrangements with the title company for a closing to take place on that date and had apparently communicated that fact to Bakken. As noted earlier, this was the extended date for closing that had been offered by Furseth in his August 27 letter. On that same date and likely after Bakken did not show for the closing, Furseth sent a letter to Johnson stating in response to his earlier letter of September 9 that Cahoon was not interested in further extending the closing date and stating: "At this time, I think you should talk to your clients about putting together the money and finalizing the deal."

32.     Also on September 26, 2012, Johnson sent a letter to Furseth, stating Bakken would not be closing on the purchase on that date and that it was unprofessional for Cahoon's agent to have scheduled it for that time without first checking the availability of Bakken's principals. Johnson then went on to reargue who was responsible for the delays, focusing in particular upon the updated abstract not being provided until July 24 and that Cahoon had not provided an explanation for the federal tax liens and the state court judgment he had raised as concerns. Johnson also stated that it was untrue that the reason for the delay in closing was due to an inability of Bakken to come up with money for the purchase price. As suggested proof, he attached an unsigned letter from Momentum Funding dated September 25, 2012, stating that it had given a preliminary loan approval for the purchase on February 8, 2012, and then noting a list of conditions and documents that would be required before Momentum Funding could proceed forward to do its own review of the matter.

Johnson also attached a copy of Momentum Funding's February 8, 2012, letter stating it would commit funds subject to its review and underwriting.

The reality, however, was that Bakken was not prepared to close for reasons other than the lien questions raised by Johnson, which he and Bakken had more than enough time to resolve by that point as discussed later. The attached letter from Momentum Funding made clear it would not be advancing funds until it had completed its own review of the project's feasibility and that this would take place only after it had been provided with a number of documents or other information, including the appraisal that was not completed until the day after Momentum Funding's letter. Further, although not critical to the court's decision, Momentum Funding's letter is somewhat curiously worded and a fair inference is that the recitation of some of the conditions was tailored to bolster Bakken's arguments for why Cahoon was responsible for the delay.

Johnson enclosed a new proposed addendum with his September 26 letter that contained three provisions. The first was that Cahoon would have to provide a satisfaction of the state court judgment that Johnson referred to in his earlier correspondence. The second was that Cahoon would have to provide documentation regarding the previously referenced federal tax liens. The third was that, upon receipt of this documentation, Bakken would have 15 business days to raise any objections, but, if the documentation was satisfactory and no objections were raised, Bakken would close on the property within 45 days.

**33.** Furseth responded to Johnson's September 26 letter by an email dated September 27, 2012, stating that Cahoon was no longer willing to negotiate and that he had been instructed to initiate a contract cancellation proceeding. Then, on October 1, 2012, Furseth forwarded a letter to Johnson stating Cahoon was providing official notice of cancellation of the contract.

**34.** Johnson responded to Furseth's September 26 letter and his September 26 email with a letter dated October 3, 2012, that repeated the same arguments about the lack of Bakken's receipt of an updated abstract until five days prior to the July 31 closing and the failure of Cahoon to address the state court judgment and federal tax liens. The letter went on to state that Bakken was still willing to move forward to a closing that included an appropriate amount of time for underwriting and resolution of its lien concerns and that it wished to avoid costly litigation.

**35.** When a satisfactory response was not forthcoming, Bakken commenced this action on October 19, 2012, seeking, among other alternative relief, specific performance of the purchase agreement and attaching to the complaint as the agreement: (1) a copy of the initial purchase agreement and addendum, (2) the addendum executed by the parties during the first week of April, and (3) the addendum signed by Bakken on July 20, 2012, and countersigned by Cahoon on July 24, 2012, which extended the closing date to July 31, 2012. Bakken also filed a lis pendens against the property.

**36.** After the commencement of the litigation, the property in question remained available for sale and was unsold as of the time of the trial more than 2½ years later. The credible evidence is that Cahoon would still have sold the property to Bakken if Bakken had been able to come up with the purchase price. And, in anticipation that this could still occur, but without any reliance upon an affirmative representation from Cahoon, Bakken continued to spend money on the project. In particular, almost a year later in October 2013, Bakken had THK prepare an updated market appraisal. Then, in December 2013, Bakken Ventures (an LLC that Oltmans testified was affiliated with Bakken) engaged Jehn Engineering to do the final engineering for the project, including a final plat and updated survey, and eventually completed 95% of that work. Oltmans testified that the

reason why Bakken Ventures engaged Jehn Engineering at that time and ran up a $86,836.50 bill was so that they would not "lose the 2014 construction season." Clearly, for a long time after Cahoon formally declared the purchase agreement to have terminated, Bakken believed that it would be able to complete a purchase if it could come up with the money by using the litigation as leverage.

By 2015, the demand for oilfield workforce housing had collapsed with the falling oil prices. At or shortly before trial, Bakken abandoned its demand for specific performance.

**Additional findings of fact relevant to the claims for relief**

**37.** One of the questions raised by Bakken's claims is whether the old federal tax liens and the state-court judgment against Cahoon's predecessor-in-title dating back to 2008 and before, which attorney Johnson suggested were of concern, were actually valid liens on the property in 2012 or thereafter. The court finds based on the credible evidence that they were not.

The mere presence of copies of the federal tax liens in the abstract and its reference to the state-court judgment are not evidence that the liens were valid during the time period at issue. The only way to make that determination would be to check the public offices where the liens are filed and where any releases or satisfactions similarly are either filed or noted. See 26 U.S.C. § 6323(f)(1)(A)(i) (federal tax lien); N.D.C.C. ch. 28-20 (judgments), § 35-29-02 (federal tax liens). And here, the abstractor certified (more than once) that the requisite checks had been made and that there were no *unsatisfied* federal tax liens or judgments against the relevant persons named in the abstract (including Cahoon's predecessor in title against whom the liens were against) as of the date of the certifications, which were after the filing of the federal tax liens and state-court judgment

noted earlier in the abstract, indicating that they had been subsequently released or satisfied.[8]

**38.** Separate from the question of whether the federal tax liens and the state-court judgment had in fact been released or satisfied, is the question of whether Cahoon fulfilled its obligation under the purchase agreement in terms of what it agreed to provide with respect to evidence of title. As noted earlier, the purchase agreement required only that Cahoon provide a title commitment 30 days after the execution of the purchase agreement and then a title policy at closing. And, while Cahoon did not initially deliver the title commitment within 30 days of execution of the original purchase agreement, it did provide the title commitment on July 19, 2012, and the credible evidence is that the title company was prepared to issue the title policy at closing that would have insured Bakken against the consequences of its title being encumbered by any liens, including the old liens that attorney Johnson said still might be of concern. At least as of that point, Cahoon had substantially performed what it was required to provide in terms of title.

Bakken appears to argue that Cahoon never demonstrated that the title it would be conveying

---

[8] While the court's reliance upon the professional judgment of the abstractor is sufficient with respect to this point (particularly since Bakken introduced the abstract into evidence without any limitations upon its use), Cahoon's attorney did forward to attorney Johnson releases of all but one of the old federal tax liens in January 2013 after this action had been commenced. The releases, which have been introduced into evidence, were dated on various dates in 2008 and were filed with the Williams County Treasurer/Recorder on various dates the same year. This indicates that the abstractor was correct in terms of these liens not being outstanding later when she certified that they were not, which further leads the court to conclude that she likely was correct with respect to the remainder. Also, the court observes that the one federal tax lien for which a copy was not provided indicates that all individual lien amounts being claimed by the IRS expired by their terms on or before the end of May 2012, with the exception of one tax item in the amount of $2357.95, which expired on April 30, 2013.

Bakken contends that proof of actual satisfaction of the liens was required because the IRS could refile notices of the liens. Bakken, however, fails to cite any authority holding that the IRS would have the right to foreclose upon the liens and force a sale if Bakken purchased the property prior to new notices being filed. In fact, the contrary is true. To obtain priority and perfect its liens against a subsequent purchaser, the IRS, having once released the liens, would have to file new notices prior to the purchase. See United States v. Union Central Life Ins. Co., 368 U.S. 291, 294-95 (1961); 26 U.S.C. § 6323(a); see generally 34 Am. Jur. 2d Federal Taxation ¶ 71968 (database updated November 2015). And, to guard against the unlikely event that this would have been done, the court suspects the title company would check the records just prior to closing to make sure that there was not any last minute filing of any liens or judgments. Morever, as discussed in a moment, Bakken would have been protected in any event by the title insurance it bargained for.

was marketable given attorney Johnson's opinion, which "required" that Bakken obtain releases or satisfactions of the federal tax liens and the state court judgment, and that Cahoon never provided them - at least not on a timely basis and not completely. Putting aside whether the mere existence of a lien necessarily renders a title unmarketable in contrast to an actual defect in title,[9] the court concludes that Cahoon in fact provided what was reasonably required by the purchase agreement in terms of marketability given the agreement of the parties to rely upon title insurance and the fact that the title insurance would provide protection against the consequences of the liens that attorney Johnson pointed to, keeping in mind that attorney Johnson never contended that the liens were still valid, only that he wanted more evidence than the certification of the abstractor that the liens were not, and the fact that he had also concluded Cahoon had good title to convey. Under these circumstances, the court finds and concludes that, if Bakken wanted confirmatory evidence that the abstractor had not made a mistake, notwithstanding that it would be insured against that possibility, it was up to Bakken to satisfy itself that the old liens were not valid.[10]

Further, this was something that Johnson could have accomplished relatively quickly. And, a fair inference here for why Bakken did not in August do what it took to get the issue resolved to insure it would not lose the property and with it the opportunity to cash in on its forecasted millions

---

[9]  Theoretically, the existence of the liens, even if valid, would not render the title unmarketable unless the lien amounts exceeded or threatened to exceed the value of the property. That is, a purchaser could pay less and then simply pay off the liens.

[10]  Bakken contends that it had been advised by attorney Johnson that the title insurance it had bargained for would not be enough to protect it because it would not cover the value of the improvements on the property. While that might be true if Bakken never acquired good title to the property and for that reason lost it and the improvements, this never was an issue here, since even attorney Johnson's title opinion indicated that Cahoon had good title. In terms of the old liens that Johnson claimed still might be of concern, the title insurance was more than adequate since the lien amounts were far less than the purchase price, which would have been the insured amount, and Bakken could simply have paid off any liens that might have been foreclosed upon using the insurance proceeds if the title insurer did not do that itself.

in future revenues was that it was not able to close for other reasons as discussed in a moment. Rather, the fair inference is that Bakken was content to argue that Cahoon needed to do the work to satisfy Bakken's purported concerns over the old liens and argue that Cahoon's failure to do so justified further extending the closing date.

Particularly telling as to what in all probability was Bakken's lack of *actual* concern over the abstract's references to the old liens is the fact that, even though attorney Johnson had raised the lien issue in early August and rendered his title opinion on August 15, 2012, Bakken proceeded to incur the expense for the appraisal/market survey in September 2012. Also, much later it incurred the cost for updating the appraisal/market survey in October 2013 and then, through Bakken Ventures, ran up the huge bill for final engineering mentioned earlier.[11]

**39.** The court finds that, even if Bakken should have been given a reasonable amount of time beginning in late July to examine the abstract and clear up the issues raised by attorney Johnson in the beginning of August, this all could have reasonably been completed by Bakken and its attorney by the end of August and this would still have allowed Bakken's lender reasonable time to do its review prior to a September 26, 2012 closing. The court further finds that, if Bakken and its attorney had done this, Bakken still would not have been able to close before the end of September because the appraisal/market analysis had not been completed until September 26, 2012, and, according to Bakken's testimony, its lender needed more time than a day or two for "underwriting." Further, the credible evidence is that, even with the appraisal/market analysis, the

---

[11] In fact, if (1) the possibility that the liens might still might be valid was really of concern to Bakken, notwithstanding (a) what it had been provided to the contrary in terms of the certification of the abstractor and the title opinion from the attorney for the title company and (b) the fact that it would be insured against the possibility of the liens still being valid in any event, and (2) Bakken had really wanted to get the purchase completed, it could have offered to escrow an amount equivalent to the liens pending the determination of their validity and close on the purchase.

lender would not have advanced the money for the purchase at that point, given the project's other uncertainties, including the fact that sewer capacity would be not be available until well into the next year at the earliest and other unresolved issues with the City.

Finally, even if the court is wrong about the time period in which Bakken could have reasonably resolved attorney Johnson's issues, there is no reason why Bakken could not have resolved them and offered a firm closing date by the end of 2012 or at any time during 2013 when it continued to expend money on the project in an apparent belief it would still be able to purchase the property.

In short, the court concludes that, even if Cahoon breached the purchase agreement by not providing title information sooner, including an updated abstract, and even if attorney Johnson's concerns about the status of the federal tax liens and the state-court judgment initially were reasonable in terms of justifying some additional time for investigation, these matters were not the proximate cause of Bakken not purchasing the property and thereby rendering for nought the costs and liabilities it incurred in anticipation of completing the purchase and going forward with its project.

**40.** Bakken's principals suggested during their testimony that they were misled by Cahoon's listing for the property as to the availability of sewer service, the zoning, and that the property was permitted for a mobile home park. It appears this testimony was offered primarily to engender sympathy for Bakken's equitable claims since no claim for fraud or misrepresentation has been made. In any event, the court is not persuaded.

For one thing, there was sewer and water service to the site and Cahoon did in fact have a state mobile home park license and a local conditional use permit to construct at least the first phase

of a mobile home park. The court does not believe the few statements made in the listing agreement promised more than that or that a reasonable purchaser would have extrapolated from the statements (which, at most, appear to be typical sales puffery), that nothing more would be required for a project like the one that Bakken wanted to develop.

Bakken's principals testified at length about their substantial experience in developing real estate, including their familiarity with what it takes to get property entitled and "shovel-ready" and how difficult a process that it sometimes can be. While Bakken may not have known initially that Ray lacked sufficient sewage treating capacity to handle the proposed development, it should not have come as a huge surprise given how small Ray is relative to the size of its project, which included a large high-density residential area and lots for commercial uses, such as motels and restaurants, that obviously would place sizeable demands on available sewage treatment capacity. Likewise, the same is true for the zoning. It defies belief that the principals of Bakken, as savvy as they claimed to be, did not know the zoning on the tract was "highway commercial" before they signed the purchase agreement and did not appreciate the possibility that they might need a zoning change and/or their own conditional use permit to develop a tract as big as this one. More likely is that they anticipated that there could be problems and it was to deal with contingencies like these that Bakken negotiated a 60-day due diligence period and specific "outs" if the zoning and/or utilities were not sufficient as described in more detail in a moment.

Finally, any purported expectations on Bakken's part as to the sufficiency of the zoning and utilities did not find their way into the purchase agreement in terms of Cahoon contractually guaranteeing what was available. The only provision in the agreement addressing utilities was the following:

1. **UTILITIES:**  The purchase of the Property in [sic] contingent upon approved utilities (domestic water, sanitary sewer, electric and natural gas) capacity and feasible delivery for the Property coinciding with the Buyer's intended use and intended development time frame. Should a utility issue occur, Buyer shall require an additional Thirty (30) days to achieve the desired utility approvals.

In terms of zoning, the purchase agreement similarly provided:

4. **ZONING:**  The purchase of the Property in [sic] contingent upon the zoning of the Property coinciding with the Buyer's intended use.  Should a zoning issue occur,  Buyer shall require an additional Thirty (30) days to achieve the desired changes to the zoning.

These provisions contain no guarantee with respect to the sufficiency of the zoning and utilities. Rather, they recognize the possibility that something more might be required and give Bakken an additional out in terms of its obligation to purchase the property that was "belt and suspenders" to its overall right to back out at any time during the 60-day "due diligence" period.

Bakken was undoubtedly disappointed by the fact that what turned out to be required for the project to go forward was more than what it initially hoped would be the case.  Bakken, however, had numerous opportunities after learning of the problems to get out early and recover back most, if not all, of its earnest money.  Instead, it elected to move forward hoping to reap millions in future revenue.

## CONCLUSIONS OF LAW

### Unjust enrichment claim

**41**.     Bakken contends that Cahoon has been unjustly enriched to the extent that its tract of land increased in value by the entitlements Bakken claims to have secured for the property.  The North Dakota Supreme Court has explained the doctrinal basis for a claim of unjust enrichment and set forth the elements that must be satisfied as follows:

[¶ 14] Unjust enrichment is a broad, equitable doctrine which rests upon quasi or constructive contracts implied by law to prevent a person

33

from unjustly enriching himself at the expense of another. <u>Smestad v. Harris</u>, 2012 ND 166, ¶ 16, 820 N.W.2d 363. The doctrine is applied in the absence of an express or implied contract. <u>Zuger v. North Dakota Ins. Guar. Ass'n</u>, 494 N.W.2d 135, 138 (N.D.1992). Unjust enrichment requires: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law. <u>Estate of Hill</u>, 492 N.W.2d 288, 295 (N.D.1992). The essential element in recovering under the theory is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value. <u>Zuger</u>, at 138. A determination whether there has been unjust enrichment is fully reviewable as a matter of law. <u>Erickson v. Brown</u>, 2012 ND 43, ¶ 25, 813 N.W.2d 531.

<u>Hayden v. Medcenter One, Inc.</u>, 2013 ND 46, 828 N.W.2d 775.

42.    A fundamental problem for Bakken's claim of unjust enrichment here is that the doctrine does not apply when there is an express agreement between the parties since, as pointed out in <u>Hayden,</u> the doctrine is premised upon the absence of an express contract. In <u>Lochthowe v. C.F. Peterson Estate</u>, the North Dakota Supreme Court more fully explained this point, stating:

> [¶ 10] When an impoverishment results from a valid contractual arrangement made by a party, the result is not contrary to equity and there has been no unjust enrichment. <u>BTA Oil Producers v. MDU Res. Group, Inc.</u>, 2002 ND 55, ¶ 23, 642 N.W.2d 873. *Therefore, we have said unjust enrichment generally applies only in the absence of a contract between the parties, and there can be no implied-in-law contract when there is an express contract between the parties relative to the same subject matter.* Id. at ¶ 37.

<u>Lochthowe</u>, 2005 ND 40, ¶ 10, 692 N.W.2d 120 (italics added); <u>cf.</u> <u>Ringler America v. Land O'Lakes, Inc.</u>, 106 F.3d 825, 829 (8th Cir. 1997) (applying Minnesota law).

In this case, there was an express contract between the parties that covered the subject matter, at least for most of the period of time when Bakken claims to have secured the entitlements.[12] And, for the remainder of the time, there is nothing that Cahoon did that encouraged Bakken to

---

[12]   Even if relevant, Bakken is not in a position to claim that the available legal remedy was inadequate since Bakken had a claim for specific performance, which it decided to abandon. The fact that Bakken may not have prevailed on the merits or did not have the resources to complete the purchase does not mean the remedy was not available or inadequate.

continue spending money on the project.

**43.** While the foregoing disposes of Bakken's claim of unjust enrichment, Bakken also has failed to demonstrate any amount of enrichment that rises above the level of pure speculation. Further, and more significantly, it has failed to offer credible evidence of any enrichment during the time frame that the court would consider relevant for any equitable recovery, whether it be a claim for unjust enrichment or as an equitable factor to be considered in support of a claim of quantum meruit.

To arrive at its unjust enrichment number, Cahoon takes THK's estimate of the sum of the market values it placed on fully-entitled residential and commercial lots in Bakken's proposed development as of September 26, 2012, which amounts to $6,885,500, and then subtracts from that the purchase price of the property of $3,400,000, which Bakken assumes was the unentitled value of the property. The difference of $3,485,500 is what Bakken contends is the amount Cahoon was unjustly enriched. In other words, Bakken is suggesting that the work it did more than doubled the value of the property, even though not one shovel-full of dirt was turned. There are numerous problems with this approach and evidence that Bakken relies upon to support it, including the following:

First, the THK estimate that Cahoon relies upon was made in September 2012, and, while it was later updated in 2013, it did not address the time period contemporaneous to the trial of this case in 2015 when the evidence clearly is that property values, as well as the demand for property, plummeted with falling oil prices and the "bloom coming off the Bakken rose." The court rejects Bakken's argument that the time period for considering the value of Cahoon's property for purposes of any equitable claim for relief is 2012 or even 2013. The reason is quite simple. To have realized

any purported enrichment of the property during this time frame (which the court believes to be entirely speculative in any event for reasons expressed in a moment), Cahoon would have had to sell the property. And here, not only has Bakken failed to offer *credible* proof that there was a market out there for a large mobile home park in the small community of Ray, remote from any large population center, even in 2012-2013, Bakken took efforts to prevent a sale to another buyer from happening. That is, it sued Cahoon in October 2012 for specific performance and, to ward off other buyers, it filed a lis pendens. Further, it maintained its demand for specific performance and continued to spend money on the project through 2013, apparently having concluded that it had effectively tied up the property with its lawsuit.

Second, even if the property had become fully entitled (which it was not as detailed further in a moment), much of what Bakken is claiming for entitlements is the rezoning of the western half of the property to R-3 and the *preliminary* plat that subdivided the western half of the tract into lots sized for a mobile park and associated city streets and commercial lots of various sizes on the eastern half of the property. These purported entitlements would only be of value for a new buyer wanting to complete essentially the same development. A new buyer wanting to use the property for different purposes might need different zoning and may very well want to lay out the property differently in terms of how the lots, streets, and points of access are situated, all of which would require a new buyer to start over with the zoning and platting processes.

Third, THK's numbers are premised upon the lots within Bakken's development being fully entitled and "shovel-ready" for development. That, however, never happened. Bakken's principals acknowledged in their testimony that Bakken neither sought nor obtained either final plat approval or the conditional use permit (or its equivalent) that was being required by the City for the

development. And, there was no guarantee in 2012, much less later in 2015, that the City would have given final approvals for the same project on terms acceptable to a new buyer, even assuming there was a buyer who would want the property for the exact same development of a mobile home park on one half and commercial lots on the other. Also, Bakken did not get to the point of resolving a number of economic issues that the City indicated would be conditions on its approval of the project, including what the City ultimately was going to insist upon in upfront fees for sewer service as well as for a contribution towards the cost of the development of a municipal park on property adjacent to the project site. These things also might very well impact the ultimate value of the property.

Fourth, to the extent that Cahoon's property has increased in value, it is probable that it would have been largely due to the fact that the City eventually developed the increased sewage treatment capacity. And, while part of the genesis of the City going forward to do this may have been Bakken's proposed development, it appears not to have been the only thing since the City was unwilling to grant Bakken first call on the increased capacity to the exclusion of other developers. Moreover, Bakken did not contribute any money to the cost of the increased sewer capacity. Hence, there is lacking any significant impoverishment on Bakken's part that corresponds to any enrichment of Cahoon's tract resulting from the increase in sewage treatment capacity. And, in terms of THK's estimate of the values of fully entitled tracts, there is no way to separate out from its estimates how much of the value would be attributable to the assumption that utilities, including sufficient sewage treatment capacity, were available from other purported entitlements that Bakken expended its resources in attempting to obtain. Or, to state it differently, there is no evidence of what the change of zoning and the approval of a preliminary plat, which is all that Bakken essentially accomplished,

added to the value of the property, if anything.

Fifth, THK's numbers, which for reasons already stated have little if any relevancy to the time period at issue, are questionable. For one thing, THK's principal testified that its report was a preliminary estimate of values based upon information obtained from real estate brokers as to what other residential and commercial property was going for in Williams County, most of which was in close proximity to Williston, and was not a more rigorous approach typically found in an appraisal in arriving at a land value for a specific tract by looking at comparable sales in or near the Ray market. Further, no appraisal or an equivalent was made for the tract in its unentitled state to compare it to and Bakken assumes for its calculation that the purchase price was the market value, which may or may not have been the case.

Sixth, the large increase in value that Bakken claims as a result of the property becoming partially entitled and without moving one shovel-full of dirt is simply not credible. It strains credulity to believe that, if Bakken had essentially doubled the value of the property through its purported entitlement efforts, it could not have somehow come up with the money to complete the purchase, particularly given how savvy the principals of Bakken claimed to be. Noticeably absent is evidence of any attempt on the part of Bakken's principals to cash in on this huge increase in value by offering a lender personal guarantees, mortgages on their other businesses and personal residences, etc., all of which might very well have secured the amount required to purchase the property when coupled with a first mortgage.

**Quantum meruit claim**

**44**. As an alternative, Bakken seeks quantum meruit relief. Under North Dakota law, this differs from a claim for unjust enrichment in that the amount recoverable is the reasonable value of

work or services performed as opposed to the amount the other party has been enriched.  See Hayden, 2013 ND at ¶¶ 14 & 22 ( setting forth the elements for the two respective claims).  In Hayden, the North Dakota Supreme Court laid out what is required for claim of quantum meruit as follows:

> [¶ 22] Quantum meruit is an equitable action in which the law implies a promise to pay for the reasonable value of services furnished. Schmidt v. First Nat. Bank & Trust Co., 453 N.W.2d 602, 605 (N.D.1990). To prevail on a claim based on quantum meruit, the claimant must establish the recipient accepted benefits under circumstances which would reasonably notify the recipient that the claimant had an expectation of payment for the services rendered. Disciplinary Bd. v. Moe, 1999 ND 110, ¶ 14, 594 N.W.2d 317. Compensability under quantum meruit requires that the services rendered be of such a nature that, under the circumstances of a particular case, fairness and justice compel the conclusion that they ought to be compensated on an implied-in-law contractual theory because the recipient ought to have been forewarned that those services "do not come cost-free." Estate of Zent, 459 N.W.2d 795, 800 (N.D.1990).

Id. at ¶ 22.

45.     Save for one possible exception discussed later, Bakken's claim for quantum meruit fails for two reasons. The first is that there is no evidence that Cahoon had any reason to believe it would somehow be responsible for the amounts that Bakken spent in its attempts to obtain various governmental permits and approvals as well as for the engineering on its project.  Second, justice and fairness do not support quantum meruit relief in any event.

In this case, there was an express agreement between the parties that defined their rights and responsibilities, at least up through the point when Cahoon declared the purchase agreement to have terminated.  Pursuant to that agreement, Cahoon was merely a seller of undeveloped property; it had not agreed to take on any risk with respect to Bakken's real estate venture and become an investor or partner in the project, nor is there evidence that Cahoon was somehow otherwise forewarned that it would become obligated for Bakken's costs.  In fact, the evidence discussed earlier is to the contrary.  When Bakken encountered problems that caused its project costs to increase, it did not

ask Cahoon to ante up. The only thing it did at one point was to attempt to negotiate down the purchase price, but, when that failed, it soldiered on. Also, the parties recognized the possibility that some of the work Bakken was doing might later be helpful to Cahoon if Bakken elected not to proceed with the purchase and Cahoon decided to pick up the pieces and proceed with the same development. As noted earlier, the second addendum/first amendment included a specific provision giving Cahoon a right to purchase at cost Bakken's drawings and consultant reports within fourteen days if Bakken elected not to purchase the property. Notably, what was not included was a contractual "put" requiring Cahoon to purchase the drawing and consultant reports at cost if Bakken elected not to go forward, which, essentially, is what Bakken is seeking now.

Finally, there is nothing that took place after the agreement terminated that changed any of this. Rather, it appears that the reason why Cahoon officially put Bakken on notice that it considered the purchase agreement to have officially terminated, even though it appears likely Cahoon would still have sold the property if Bakken had been able to come up with the money, was to avoid exactly what Bakken is claiming now.

Under these circumstances, to award Bakken money for its failed development costs would upset what were the contractual understandings of the parties and do great mischief by creating doubt for other persons attempting to plan and organize their affairs by entering into express contracts. Cf. Schmidt v. First Nat. Bank and Trust Co., 453 N.W.2d 602, 605 (N.D. 1990) ("The courts would be opening a Pandora's box of nonmeritorious claims if a real estate agent were allowed to seek quantum meruit recovery when the agent failed to earn a commission under the terms of his contractual agreement. Schmidt was entitled to recover, if at all, only by meeting the conditions of his oral contract. He cannot rely on quantum meruit to receive compensation, if he

failed to do what his contract required of him. We agree with the trial court that under these circumstances Schmidt, as a matter of law, is not entitled to recover under a theory of quantum meruit."). In fact, this is reason enough to deny quantum meruit relief even if even if Bakken's efforts (as opposed to efforts of others such as the City increasing its sewer capacity) increased the value of Cahoon's property more than a nominal amount, which the court doubts.

46.     In short, the court concludes that Bakken is not entitled to quantum meruit relief except for the possibility of the earnest money addressed later. Consequently, the court need not decide whether the specific items that Bakken is claiming as damages would be recoverable.[13]

**Breach of contact claim**

47.     Bakken contends that Cahoon was in breach of the purchase agreement because it was unable to convey marketable title. The court disagrees for the reasons articulated earlier.

48.     Bakken claims that Cahoon breached the purchase agreement by not providing on a timely basis what it contends it was owed in terms of evidence of good title. One of the things that Bakken points to was the failure of Cahoon to provide a title commitment within thirty days of the execution of the purchase agreement.

The court agrees that Cahoon was in breach of the purchase agreement in March 2012 in failing to provide an initial title commitment within 30 days of its execution. Bakken, however, did not elect to treat the agreement as terminated and ask for its earnest money back. Rather, it executed

---

[13] That being said, it is highly doubtful the court would award the amount being claimed for the work done by Jehn Engineering. Aside from the reasons already expressed for why the court would not grant quantum meruit relief generally, the work performed by Jehn is not in the public domain and there is no guarantee that Jehn would provide its work to Cahoon without an additional charge, even assuming Bakken Ventures or Bakken finally paid Jehn's bill. As for the fact Jehn has not been paid, there is an incongruity here in Bakken demanding equitable relief when itself has refused to do equity in terms of seeing to it that Jehn was paid. Finally, the court has not been assured that any award to Bakken would find its way into Bakken Venture's pocket, which is a separate LLC, much less be used to satisfy Jehn's bill over what might be other demands upon its funds, including any claims by Bakken's principals for compensation for the work they performed.

two more amendments to the purchase agreement after Cahoon had missed the March deadline, the last of which extended the closing date to July 31, 2012, and was signed off on by Bakken after Cahoon had provided the title commitment on July 19, 2012. Given this, the court concludes that Bakken waived Cahoon's initial breach in not providing the title commitment sooner. As noted by the North Dakota Supreme Court in Savre v. Santoyo, 2015 ND 170, 865 N.W.2d 419:

> "Waiver may be established either by an express agreement or by inference from acts or conduct." Pfeifle v. Tanabe, 2000 ND 219, ¶ 18, 620 N.W.2d 167 (citing Hanson v. Cincinnati Life Ins. Co., 1997 ND 230, ¶ 13, 571 N.W.2d 363) (emphasis added). "Waiver may be found from an unexplained delay in enforcing contractual rights or accepting performance different than called for by the contract." Pfeifle v. Tanabe, 2000 ND 219, ¶ 18, 620 N.W.2d 167; see also Dangerfield v. Markel, 252 N.W.2d 184, 191 (N.D.1977).

Id. at ¶ 21. In addition, any breach on Cahoon's part in missing the March deadline was not the proximate cause of any of the damages being claimed by Bakken based on the court's earlier findings. See, e.g., Swain v. Harvest States Cooperatives, 469 N.W.2d 571, 575 (N.D. 1991) ("An award of damages for tort or breach of contract must not be based on conjecture or speculation and must be proximately caused by either the tort or breach of contract.").

Bakken claims that Cahoon also breached the purchase agreement by not providing it with an abstract of title within five days of execution of the agreement. As previously discussed, however, the purchase agreement did not require that Cahoon provide an abstract since the parties had decided upon the use of title insurance, but, even if the court is wrong about that point, Cahoon was not obligated to provide one until the time of closing.

Notwithstanding the express language of the agreement, Bakken argues at length that Cahoon was required to provide the abstract as a matter of good faith and fair dealing. Bakken contends that, even though the North Dakota Supreme Court has only recognized that there is an implied covenant of good faith and fair dealing in insurance contracts, it would extend the doctrine to real estate

purchase agreements and urges the court to so conclude. Bakken, however, has ignored <u>WFND, LLC v. Fargo Marc, LLC</u>, 2007 ND 67, 730 N.W.2d 841, where the North Dakota Supreme Court not only rejected application of the doctrine to a real estate purchase agreement[14] but also concluded that the doctrine would have no applicability where, as here, there was an express provision of the agreement specifically addressing the subject matter. The court stated:

> [¶ 17] First, not only did WFND fail to plead breach of an implied covenant of good faith and fair dealing, but "[i]n North Dakota the doctrine of an implied covenant of good faith and fair dealing has only been applied to insurance contracts." <u>Dalan v. Paracelsus Healthcare Corp.</u>, 2002 ND 46, ¶ 11, 640 N.W.2d 726. Moreover, the implied covenant of good faith and fair dealing does not provide WFND any solace because it does not operate to alter the material terms of a contract. " 'The duty to act in good faith "does not obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions," nor does the duty of good faith "inject substantive terms into the parties' contract." ' " <u>Id.</u> at ¶ 13 (quoting <u>Barnes v. St. Joseph's Hospital</u>, 1999 ND 204, ¶ 14, 601 N.W.2d 587); <u>see</u> <u>also</u> <u>Basin Elec. Power Coop.</u>, 248 F.3d at 796 ("Courts must be careful when considering good faith, however, as it does not imply 'an everflowing cornucopia of wished-for legal duties.'") (internal citation omitted). WFND cannot rely on the doctrine of good faith and fair dealing to supplement the terms of the purchase agreement.

<u>WFND</u>, 2007 ND at ¶ 17.

Finally, not only did Cahoon not breach the agreement by not providing the updated abstract prior to July 24, 2012, any such breach was not the proximate cause of any of the damages being claimed by Bakken based on the court's earlier findings.

**49.** Bakken further contends that Cahoon breached the purchase agreement by not providing it with either satisfactions or releases of the federal tax liens and the state-court judgment once attorney Johnson expressed concern about them. Again, the court disagrees that there was such an obligation for the reasons stated earlier either as part of a requirement to provide evidence of

---

[14] This court has previously read <u>WFND</u> to mean that the implied covenant of good faith and fair dealing should not be applied to noninsurance agreements. <u>Macquarie Bank Ltd. v. Knickel</u>, 723 F. Supp. 2d 1161, 1193 (D.N.D. 2010) ("An insurance contract is not in dispute in this action and, therefore, there can be no breach of a duty of good faith and fair dealing under North Dakota law.").

marketable title or as a matter of good faith or fair dealing. In any event, this claimed breach too was not a proximate cause of the damages Bakken is claiming.

**50.**     Bakken claims that Cahoon was required to provide a survey of the property and failed to provide one. Cahoon disagrees, claiming that he gave Bakken free access to whatever information Interstate Engineering had developed for the property at his expense.

While the purchase agreement did require that Cahoon provide a survey of the property, it was not specific in terms of the level of information that would have to be contained in it. And, absent further specification in the agreement, the court construes it as requiring a survey that would confirm the location of the property being sold, its size and dimensions, and that the survey lines would close.[15] Most likely this information already existed since, according to the abstract, the property had previously been platted as one lot in a large addition to the City. Further, Interstate Engineering likely had the information due to the fact that it was the City's engineer and also had previously done work for Cahoon. But, even if the survey did not exist, Bakken has not introduced evidence of what the cost was to reproduce this level of survey information. Hence, no award is made for this item.

### Earnest money

**51.**     Under the initial purchase agreement, Bakken was obligated to deposit with Cahoon's broker $20,000 in earnest money that would be applied to the purchase price of the property once the sale was consummated. Further, it provided two alternative provisions for the seller's damages

---

[15] Bakken may have needed a more detailed survey for its lender that would show additional information, such as the location of roads providing access to the property, utilities, and easements. In fact, it may have needed this information to be depicted in relation to Bakken's proposed layout of streets and lots to insure that there would be sufficient access and no conflicts. The court concludes that this level of survey information was not required by the contract because it did not expressly provide for it.

if the sale was not consummated with boxes for checking which of the two provisions was being selected. The first allowed for the seller to recover all actual damages in the event of a failure on the party of the purchaser to complete the purchase. This is the one that was selected. The other limited the seller to keeping the earnest money as liquidated damages. Later, the purchase agreement was amended to require the deposit of an additional $30,000 of earnest money and further provided that, of the total $50,000 on deposit, $20,000 of the earnest money would become nonrefundable upon preliminary plat approval, which did take place, and that the remaining $30,000 would become nonrefundable upon approval of the final plat, which did not.

Construing all of these provisions together, the court concludes that Bakken is entitled to a return of $30,000 of the earnest money, either as an implied requirement of the purchase agreement or as matter of quantum meruit.[16] The court does not, however, award interest because, up until shortly before trial, Bakken took the position it was entitled to specific performance and had not demanded return of the earnest money. Further, Cahoon's only obligation is to return the money on deposit and not that it was generally indebted to Bakken for said amount.

### Failure to maintain certificate of authority

**52.** Cahoon contends this case must be dismissed because N.D.C.C. § 10-32-145(1) prohibits a foreign limited liability company from maintaining suit "in any court of this state" until it possesses a certificate of authority and that here Bakken's certificate authority lapsed prior to commencing this action and had not been renewed or reacquired at the time of trial. This defense was raised for the first time at trial. After it was raised, the court reserved ruling and asked the

---

[16] Cahoon had not offered proof of any actual damages, so the court need not decide whether the later amendment superseded the earlier provisions, such that the $30,000 would be refundable so long as final plat approval was not obtained.

parties to brief the issue. Following the trial and before the court's ruling on the issue now, Bakken did obtain the requisite certificate of authority.

Even assuming that § 10-32-145(1) governs the eligibility of an out-of-state limited liability company to invoke this court's diversity jurisdiction and not federal law,[17] Cahoon waived its ability to rely upon § 10-32-145(1)'s prohibition as a defense by not raising the issue sooner. The court reaches this conclusion as follows:

- First, the court predicts the North Dakota Supreme Court would construe § 10-32-145(1) as affecting only a limited liability company's capacity to sue and that its prohibition is subject to waiver. See generally 19 C.J.S. Corporations § 1020 ("The failure of a foreign corporation to qualify to do business in the state, so as to be entitled to sue, is a matter of defense to be raised affirmatively in the pleadings.[1]") (footnotes omitted); 18 Fletcher Cyc. Corp. § 8628 (database updated Nov. 2015) ("Although there is authority to the contrary, the defense that a foreign corporation is doing business in the state without qualifying usually is waived unless it is pleaded by the defendant at an early stage of the proceedings, unless some valid legal excuse is presented.") (footnotes omitted); cf. Vermeer Industries of North Dakota v. Bachmeier, 486 N.W.2d 506 (N.D. 1992) ("Lack of capacity to sue is not a jurisdictional defect, and a failure to raise the issue during the proceedings results in a waiver of the defense."); Basin Electric Power Coop. v. Miller, 310 N.W.2d 715,

---

[17] See, e.g., Woods v. Interstate Realty Co., 337 U.S. 535 (1949); McCollum Aviation v. CIM Associates, Inc., 438 F.Supp. 245 (S.D. Fla. 1977); but see Domino Media, Inc. v. Kranis, 9 F.Supp.2d 374, 381-82 & (S.D.N.Y. 1998) (questioning whether Woods is still good law after the Supreme Court modified its Erie analysis in Hanna v. Plummer, 380 U.S. 460 (1965)).

717 (N.D. 1981).[18]

- Second, having concluded that the issue is subject to waiver under state law, the court then applies federal procedural rules to determine when and how the issue of lack of capacity must be raised and, if not, then lost. See, e.g., Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manor, Inc., 929 F.2d 343, 345-46 (7th Cir. 1991) ("Wagner Furniture") (failure to specifically object to plaintiff's lack of capacity to sue under a similar Illinois "door-closing"statute until shortly before trial constituted a waiver of the right to object under both the federal procedural rules and Illinois law); Iowa-Mo Enterprises, Inc. v. Avren, 639 F.2d 443, 447-48 (8th Cir. 1981) (stating that the district court's exclusion of evidence at trial with respect to plaintiff's failure to possess the requisite certificate of authority to do business under Missouri law for failure to have listed the evidence of that point in its pretrial disclosures did not confer a substantive right that plaintiff did not possess in the Missouri state courts because the state courts had ruled that failure to plead the lack of the necessary authority constituted a waiver of the defense); Domino Media, Inc. v. Kranis, 9 F.Supp.2d 374, 384-85 & n.65 (S.D.N.Y. 1998) (lack of capacity based on a similar door-closing statute was an affirmative defense that was waived when not pled); cf. Hanna v. Plumber, 380 U.S. 460 (1965).

- Third, while the federal courts are not in complete agreement with respect to when

---

[18]   Even if the court is wrong about waiver, the North Dakota Supreme Court would likely conclude that noncompliance with the statute can be cured, so that, with Bakken having now obtained the requisite certificate of authority, the court can proceed to address the merits and enter judgment. See, e.g., Young America's Foundation v. Doris A. Pistole Revocable Living Trust, 2013 IL App (2d) 121122, 998 N.E.2d 94, 105-11 (Ill. App. Ct. 2nd Dist. 2013) (concluding that noncompliance with the same "door closing" was curable based on the court's construction of the statute's use of the word "maintain" and that the statute was intended to be simply coercive and not punitive).

lack of capacity must be raised and, if not, lost, the court concludes in the absence

of any apparent Eighth Circuit decision to the contrary that Fed. R. Civ. P. 8(c)(1),

9(a)(2), and 12(b), when read together, required that Cahoon plead with specificity

"lack of capacity" as a defense in its answer.[19] And, when Cahoon failed to do so

and also later failed to timely move to amend its answer to include the defense, it was

waived.[20] See, e.g., Hendricks v. Office of Clermont County Sheriff, 326 Fed.Appx.

347, 349-50 (6th Cir. 2009) (unpublished); Wagner Furniture; supra; see generally

Charles Alan Wright and Arthur R. Miller, 5A Federal Practice and Procedure §

1295 (2004) ("Wright and Miller").[21]

---

[19] See Charles Brooks, Co v. Georgia-Pacific, LLC, 552 F.3d 718, 721-22 & n.2 (8th Cir. 2009); First Union Nat. Bank v. Pictet Overseas Trust Corp., LTD., 351 F.3d 810, 815 (8th Cir. 2003); Iowa-Mo Enterprises, Inc. v. Avren, 639 F.2d 443, 446-4 & n.2 (8th Cir. 1981); but see Moore v. Matthew's Book Co., Inc., 597 F.2d 645 (8th Cir. 1979).

[20] The court would reach the same conclusion even if it treated Cahoon's belated motion to dismiss based on lack of capacity as a motion to amend its answer and to obtain relief from the deadline for amending the pleadings imposed by the court's earlier progression order. This is because Cahoon has failed to provide a good reason for why the lack-of-capacity issue could not have been raised earlier and the waste of time and resources that would result from allowing the defense to be pled now.

[21] While this may not be the only plausible reading of the federal rules, it is consistent with them. Fed. R. Civ. P. 8(c)(1) requires that "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense" and then, while it goes on to list specific defenses, it prefaces the list with the word "including," which suggests that the list is not exclusive. Rule 9(a) then goes on to treat "capacity to sue" as one of those matters that must be specifically pled, requiring in subdivision (2) that a party desiring to raise the issue "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." When these provisions from Rules 8 and 9 are considered together, a commonsense reading is that lack of capacity is a matter of avoidance that must be affirmatively pled in responding to a pleading even though it is not specifically listed in Rule 8 as an affirmative defense. Then, in terms of when the defense must be asserted and whether it is subject to being lost if it is not, Rule 12(b) requires that "[e]very defense to a claim for relief in any pleading must be asserted in a responsive pleading if one is required." And, while the remainder of subdivision (b) as well a subdivision (h) go on to recite rules that apply to certain defenses in terms of how and when they can be raised (including failure to state a claim that can be raised at trial), a straightforward reading of these provisions is that they do not apply to lack of capacity as a separate defense, just as they do not apply to many other defenses.
    The net result of all of this is that, if a defendant wants to raise the issue of a plaintiff's lack capacity to sue, the defendant must do so with specificity in the answer and, if it is not raised, it is lost unless the defendant seeks leave to amend the answer and leave is granted to include it. As Wright & Miller points out, "[t]his approach seems especially appropriate because of the waste of judicial and litigant resources that would result from the dismissal of a suit as late as the trial when one of the parties lacks the requisite legal existence, capacity, or authority to sue or be sued." Wright and Miller at § 1295. Also, with the "liberal amendment policy of Rule 15,"a court still has substantial discretion in

## ORDER FOR JUDGMENT

Based on the foregoing, it hereby **ORDERED, ADJUDGED, and DECLARED** that Bakken is entitled to a return of $30,000 of its earnest money now on deposit and shall have judgment against Cahoon for this amount. The remainder of Bakken's claims and requests for relief are denied.

Dated this 31st day of December, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court

---

terms of allowing the issue to be raised later after balancing all of the relevant considerations, including the reasons for it not being raised earlier, prejudice or lack of it, and the impact on court and litigant resources. Id.